**SIGNED THIS: September 23, 2008**

_____

**THOMAS L. PERKINS**
**UNITED STATES CHIEF BANKRUPTCY JUDGE**
_____

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **BERWICK BLACK CATTLE COMPANY,** | ) | No. 06-82166 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: | ) | |
| | ) | |
| **MARK RAY,** | ) | No. 06-82165 |
| | ) | |
| Debtor. | ) | |

## O P I N I O N

This matter came before the Court for hearing on confirmation of the First Amended

Joint Chapter 11 Plan of Reorganization ("Plan") filed by the Debtors, Berwick Black Cattle

Company and Mark D. Ray ("Debtors").  Because the Plan contains two inappropriate

third-party release provisions, confirmation will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 26, 2006, involuntary petitions for relief under Chapter 11 of the

Bankruptcy Code were filed against the Debtors by certain petitioning creditors.  The

Debtors did not contest the involuntary petitions and orders for relief were entered on February 1, 2007. On February 15, 2007, the United States Trustee ("UST") appointed an Official Committee of Unsecured Creditors (the "Committee") in these cases and the Committee at all times has been represented by counsel.

The cases, never substantively consolidated but proceeding in procedural unison, have been dominated by two major creditors: (1) High Plains Farm Credit, PCA ("High Plains") and (2) Ward Feed Yard, Inc., ("WFY") and a related entity, ILS Financing, Inc. ("ILS"). High Plains filed claims in excess of $15 million while WFY filed claims in excess of $11 million. High Plains and WFY financed the Debtors' cattle operations as secured lenders, both taking blanket liens on substantially all of the Debtors' assets. Pursuant to an intercreditor agreement, High Plains holds the senior secured position and WFY holds a second priority position. WFY provided $50,000 in emergency post-petition financing. High Plains provided traditional Debtor-in-Possession ("DIP") financing amounting to several million dollars and received a lien on all post-petition collateral pursuant to Section 364(c)(2).

The cases were in a liquidating mode almost from the beginning. With short-leash monitoring from High Plains, the Debtors systematically sold off most all of their 14,100 head of cattle, their machinery, equipment and other personal property, and, finally, their real estate.[1] All sales were authorized, after notice and hearing, pursuant to Sections 363(b) and (f) of the Bankruptcy Code.

---

[1] Unlike the DIP financing terms that this Court usually sees, High Plains was only willing to extend financing on a month by month basis, thereby preserving the right to pull the plug at any time should the liquidation of its collateral not proceed according to its liking.

On January 28, 2008, the Debtors filed joint Chapter 11 Plans, providing for substantive consolidation of the estates and for the creation of a Liquidating Trust. On February 29, 2008, joint Disclosure Statements were filed by the Debtors. Because of subsequent developments, the initial plans and disclosure statements did not proceed toward approval and were ultimately abandoned by the Debtors.

On June 24, 2008, the Debtors filed the Plan and a new Disclosure Statement with respect thereto. After appropriate notice, and without objection, the Disclosure Statement was approved on August 6, 2008, and the Plan was sent out for balloting in accordance with and accompanied by a copy of the Order and Notice Regarding Approval of Disclosure Statement. The Order and Notice, prepared by Debtors' counsel, contains the following paragraph printed in bold-faced type:

> 3. **Pursuant to Rule 2002(c)(3) of the Federal Rules of Bankruptcy Procedure, you are hereby notified that Section 8.3 of the Plan contains releases of various parties, including Lee Borck, Ward Feed Yard, Inc., WFY Holdings, Inc., ILS Financing, Inc., James Porter, Joseph Porter, Robert Kinton and John Farley (collectively, the "Ward Entities"), who are providing a substantial portion of the financing that will permit the reorganization of the Debtors contemplated by the Plan. The releases of the Ward Entities, upon confirmation of the Plan, will enjoin the Debtors' creditors and all persons and entities with an interest in the Debtors from bringing certain actions and suits against the Ward Entities, as further detailed in the Plan.[2]**

---

[2]F.R.B.P. 2002(c)(3) provides as follows:

> (3) *Notice of Hearing on Confirmation When Plan Provides for an Injunction.* If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the notice required under Rule 2002(b)(2) shall:
>> (A) include in conspicuous language (bold, italic, or underlined text) a statement that the plan proposes an injunction;
>> (B) describe briefly the nature of the injunction; and
>> (C) identify the entities that would be subject to the injunction.

The Plan contains three separate third-party release provisions.  The first referred to as Release 6.7, states as follows:

**6.7.    Exculpation and Indemnification.  None of the Debtors, the Liquidating Trust, the Creditors' Committee, the Ward Entities, the Liquidating Trustee, or ACC, nor any of their respective present or former members, officers, directors, officers, employees, advisors, or attorneys (collectively, the "Indemnified Persons") shall have or incur any liability to any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Cases, formulating, negotiating or implementing the Plan or the Disclosure Statement, the pursuit of the approval of the adequacy of the Disclosure Statement, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan (including the distributions), except for their gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  To the fullest extent permitted by applicable law, the Liquidating Trust will indemnify, hold harmless, defend and reimburse the Indemnified Persons and each of their designated representatives from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities and actions, for any act or omission in connection with, relating to, or arising out of, the Cases, formulating, negotiating or implementing the Plan or Disclosure Statement, the pursuit of the approval of the adequacy of the Disclosure Statement, the pursuit of confirmation of the Plan, the confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan (including the distributions), except for gross negligence or willful misconduct as determined by a Final Order.  All rights of the Indemnified Persons exculpated and indemnified pursuant hereto shall survive confirmation of the Plan and the closing of the Cases.**

The second, referred to as Release 4.2.13, states as follows:

**4.2.13.    The Ward Complaints and High Plains Complaints will be dismissed with prejudice.  In addition, a release of and injunction against claims and causes of action which any of the Debtors' creditors or any party-in-interest in the Cases has or may have as of the Effective Date of the Plan against the Ward Entities, High Plains, the Creditors' Committee, the members of the Creditors' Committee (with respect to their actions as**

members of the Creditors' Committee), and professionals retained by any of the foregoing relating in any way to the Debtors or the Cases, including all litigation relating thereto pending or threatened on the Petition Date shall be included within the Confirmation Order. The dismissal of the Ward Complaints and High Plains Complaints and the releases and injunctions set forth above, shall be effective upon the earlier of the date of entry of a Final Order confirming the Plan or the Effective Date of the Plan.[3]

The third, referred to as Release 8.3, states as follows:

**8.3   Injunction.   Except for actions as Holders may take to prosecute or defend against the Debtors their respective Claims or Interests in the Bankruptcy Court, entry of a Confirmation Order will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Debtors, the Liquidating Trust, High Plains, the Ward Entities or ACC; provided, however, that to the extent that the provisions of § 362(a) have been modified by the Bankruptcy Court prior to the Effective Date, actions against the Debtors consistent with such modification and the Plan are permitted.**

All three Releases identify the "Ward Entities" as parties to be released. The Plan defines the "Ward Entities" as Ward Feed Yard, Inc., WFY Holdings, Inc., ILS Financing, Inc., Leon Borck, James Porter, Joseph Porter, Robert Kinton and/or (sic) John Farley. Curiously, in the Order and Notice referred to above, counsel for the Debtors chose to refer only to Release 8.3 and not to Releases 6.7 or 4.2.13. The record contains no explanation for this.

In support of confirmation of the Plan, WFY filed the Declaration of Leon Borck as President of Ward Feed Yard, Inc., ILS Financing, Inc. and WFY Holdings, Inc. The Borck Declaration contains the following statements:

4.   As is described in the Plan, the Ward Entities' participation in the Plan includes, among other things: (a) the making of the Ward Entities'

---

[3]The Plan provides definitions for 120 defined terms, including "Ward Complaints" and "High Plains Complaints," which are defined as the complaints asserted by the unsecured creditors committee against the Ward Entities and against High Plains, respectively.

Investments (purchase $1,000,000 of ACC Convertible Notes); (b) paying, to the extent not already satisfied by the Debtors, certain of the Allowed Administrative Claims, Priority Tax Claims and Gap Period Priority Claims; and (c) providing customary financing and feed yard services to ACC on customary terms.

5.   In exchange for the Ward Entities' participation in the Plan, the Debtors' creditors, including Twiford Enterprises, Inc., Tom Twiford and First National Bank of Wyoming, and all persons and entities with an interest in the Debtors will be enjoined from bringing certain actions and suits against the Ward Entities, as described in the Plan (the "Releases").

6.   The Releases are a critical and necessary consideration for the Ward Entities' support and funding of the Plan.

7.   None of the Ward Entities' participation in the Plan would be provided without the Ward Entities receiving the full benefit of the Releases.

Two of the parties referred to in paragraph 5 of the Borck Declaration, Twiford Enterprises, Inc., and Tom Twiford will be referred to as the Twifords.  Based upon documents attached to the proof of Claim filed by WFY on June 6, 2007, it appears that the Twifords and the First National Bank of Wyoming filed a lawsuit in state court in Albany County, Wyoming, on June 6, 2006 (pre-petition), against the Debtors, WFY and certain other defendants.  The complaint alleges that the Debtors and WFY were partners or joint venturers, that they breached a contract with the Twifords for the purchase of calves, that they delivered infected heifers to Twiford, and seeking damages and injunctive and declaratory relief in thirteen separate causes of action.[4]

On December 21, 2006, five days before the involuntary petitions were filed, an amended complaint was filed in the Wyoming case deleting First National Bank of Wyoming as a plaintiff, and removing two other originally named defendants leaving the

---

[4]In their answer and crossclaims against the Debtors, WFY denied that it was a partner or joint venturer with the Debtors.

Debtors and WFY as the remaining defendants.  The amended complaint, alleging the same basic factual allegations as the original complaint, asserts five causes of action, for Breach of Contract/Warranty, Negligence, Negligent Misrepresentation, Strict Liability and *Res Ipsa Loquitur*, and also requests punitive damages.  It also amends the characterization of the relationship between the Debtors and WFY, now alleging that they "were acting as either partners, joint venturers or pursuant to a joint enterprise."

Despite the pendency of the Wyoming lawsuit, the Debtors failed to list the Twifords as creditors on their bankruptcy schedules and failed to include their names and addresses, or that of their Wyoming lawyer, on the creditor mailing matrix.  Notwithstanding the omission, the Twifords subsequently learned of the Debtors' bankruptcy cases.[5]  On July 15, 2008, the Twifords, appearing for the first time and represented by Chicago attorney James K. Borcia, filed a Motion for Relief from the Automatic Stay, seeking to modify the stay for the limited purpose of allowing the Twifords to pursue the claims against the Debtors solely to the extent of any insurance coverage.

On July 23, 2008, the Debtors and the Twifords filed a Stipulation extending the time for the Debtors to respond to the stay relief motion, representing that they were negotiating an agreement as to the motion.  A preliminary hearing on the motion was held telephonically on August 12, 2008, at which the attorneys indicated that an agreement had been reached and that they would be uploading an agreed order.  The Agreed Order was entered on August 14, 2008, modifying the stay to permit the Twifords to pursue the Wyoming claims against the Debtors solely for the purpose of recovering any insurance

---

[5]The Twiford stay relief motion states that a notice of the bankruptcies was filed in the Wyoming suit on March 5, 2007.

proceeds.  The Agreed Order also contains the following provision:

> Twiford agrees not to assert any claims against the Debtors in the
> pending bankruptcy cases and agrees to limit their recovery against the
> Debtors in the Wyoming Case to any insurance proceeds for the claims
> asserted in the Wyoming Case.

Neither the stay relief motion nor the Agreed Order makes any mention of WFY or the

Twifords' claims against WFY.[6]

During the same period that they were negotiating and resolving the Twifords' stay

relief motion, the Debtors' attorneys were also dealing with the major undertaking of

sending the Plan out for balloting.  The Plan and accompanying solicitation materials were

mailed out to most creditors on August 8, 2008, by the Debtors' attorneys, but not to the

Twifords.  A subsequently filed Certificate of Service states that on August 11, 2008, three

days too late, the Plan and solicitation materials were mailed to the Twifords as well as to

attorney Borcia and the Wyoming attorney representing the Twifords.[7]  No ballot was

returned on behalf of the Twifords.

The Debtors filed a Report of Balloting, representing that all of the classes entitled

to vote accepted the Plan.  A preliminary confirmation hearing was held on September 3,

2008.  At that hearing, conducted telephonically, the Debtors advised the Court that

although no objections to confirmation had been filed and the Plan met the requirements

of confirmation set forth in Section 1129(a), a further hearing was requested based on the

---

[6]At the confirmation hearing, in response to the Court's inquiry, Debtors' counsel stated that no request had been made of attorney Borcia to have the Twifords consent to the release of their claims against WFY and that those claims had not been discussed during the negotiations regarding the stay relief motion.

[7]The Order and Notice Regarding Approval of Disclosure Statement set August 8, 2008, as the deadline for the Debtors to mail all solicitation materials.  The Debtors failed to meet this deadline with respect to the Twifords.  The Order also set September 2, 2008, the date exactly twenty-five days after August 8, 2008, as the last day for creditors to file written objections to confirmation.  The late mailing to the Twifords violated not only the terms of the Notice and Order but F.R.B.P. Interim Rule 2002(b)'s mandate of at least 25 days notice of the time fixed for filing objections to a Chapter 11 Plan.

Seventh Circuit's decision in *In re Airadigm Communications, Inc.,* discussed below, in order for the Court to consider the appropriateness of the Plan's provisions containing the third-party releases.   At that hearing, held on September 9, 2008, the Court questioned the appropriateness of a third-party release that releases claims beyond those arising in the bankruptcy cases, and also questioned whether notice was sufficient to comport with fundamental principles of due process.   The Court determines that two of the three Releases, 4.2.13 and 8.3, are substantively inappropriate, that insufficient notice was given to the Twifords and other unnamed releasors, and that it is without jurisdiction to order these releases.[8]

## ANALYSIS

The analysis must begin with the recent opinion that the parties acknowledge is most pertinent in this Circuit, *In re Airadigm Communications, Inc.,* 519 F.3d 640 (7th Cir. 2008).  The debtor, a cellular-service provider, filed a plan of reorganization that depended on financing by a third party, Telephone and Data Systems ("TDS").  The debtor's troubles revolved around certain personal communications services licenses it purchased at an FCC auction and opted to pay for under an installment plan set up by the FCC.  The FCC, a large undersecured creditor, objected to a plan provision that released TDS as follows:

> Except as expressly provided ... [TDS shall not] have or incur any liability to
> ... any holder of any Claim ... for any act or omission arising out of or in
> connection with the Case, the confirmation of this Plan, the consummation

---

[8] Releases 4.2.13 and 8.3, by their terms, apply to all persons and entities, without regard to whether they were scheduled creditors or had no actual notice of the bankruptcy cases.  The Twifords are only two named parties in a potentially much larger class of claimants who had a contract or relationship with the Debtors.  WFY focuses on the Twifords here because they are the only ones, to date, who have sued WFY.

> of this Plan, or the administration of this Plan or property to be distributed
> under this Plan, except for willful misconduct.

519 F.3d at 655.  The FCC argued that the TDS release violated the Bankruptcy Code.  The plan was confirmed over the FCC's objection and the Seventh Circuit affirmed.

The court first addressed whether Section 524(e) precludes third-party releases. That provision states that the "discharge of a debt of the debtor does not affect the liability of another entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524 (e). Disagreeing with the Ninth and Tenth Circuits, the court held that Section 524(e) does not limit a bankruptcy court's power to release a non-debtor from a creditor's claims.[9] Accordingly, Section 524(e) is not a basis for disallowing Releases 4.2.13 and 8.3.

The Seventh Circuit next addressed whether Congress affirmatively gave bankruptcy courts the power to release third parties from a creditor's claims without the creditor's consent.[10]  The court cited the long-standing tradition that bankruptcy courts are courts of equity, Section 105(a)'s provision that bankruptcy courts have the power to issue any order necessary or "appropriate" to carry out the provisions of the Code, and the permissive statement set forth in Section 1123(b)(6) that a Chapter 11 plan may include any "appropriate" provision not inconsistent with the applicable provisions of the Code.  In reliance upon these provisions, the court stated its ruling as follows:

> In light of these provisions, we hold that this "residual authority" permits the
> bankruptcy court to release third parties from liability to participating

---

[9]Contra, *In re Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir. 1995); *In re Western Real Estate Fund, Inc.,* 922 F.2d 592, 600 (10th Cir. 1990).

[10]The Seventh Circuit previously approved consensual third-party releases.  *Matter of Sepcialty Equipment Companies, Inc.,* 3 F.3d 1043, 1046-47 (7th Cir. 1993).  The Plan's Releases are not alleged to be consensual as to the Twifords or anyone else.

creditors if the release is "appropriate" and not inconsistent with any provision of the bankruptcy code.

519 F.3d at 657.

Recognizing that whether a release is appropriate for a reorganization is fact intensive and dependent upon the nature of the reorganization, the court determined that the TDS release "was necessary for the reorganization and appropriately tailored." Specifically, the court noted that the release was "narrow," as it applied only to claims arising out of or in connection with the reorganization and excluded wilful misconduct. The court further noted that the release did not accord TDS blanket immunity for all times and for all transgressions. The court reasoned that the release was not being used by TDS to skirt FCC regulations and that the bankruptcy court found adequate evidence that TDS required the release before it would provide financing essential to the reorganization. Since the release was "appropriate," it was within the bankruptcy court's powers.

At the confirmation hearing, counsel for the Debtors and for WFY made several arguments in support of Releases 4.2.13 and 8.3, which may be summarized as follows. Preliminarily, since the Bankruptcy Code does not expressly authorize third-party releases, the only source of authority for such a release is the Bankruptcy Court's equitable powers granted by Section 105. They argue that equity warrants the release of the Ward Entities and High Plains.

First, WFY has suffered a huge loss in these cases. At the outset, optimism was expressed that the orderly liquidation of the Debtors' assets would result in full payment to High Plains and a substantial, possibly full, payment to WFY. Unfortunately, the

11

proceeds were insufficient to pay High Plains in full rendering WFY almost wholly unsecured.

Second, even though, in the Court's view, these cases have proceeded as liquidating Chapter 11's, WFY is providing, not to the Debtors but to a different corporation, a substantial portion of what might loosely be called "exit financing." The Plan contemplates the formation of a Liquidating Trust and, separately, the use of a Nevada corporation called American Cattle Company, Inc. ("ACC"), in which Ray had a prepetition interest. The Plan contemplates creating a new capital structure for ACC, including a class of Convertible Notes, Class A Preferred Stock, Class B Preferred Stock and Class C Preferred Stock. If the Plan is confirmed, WFY agrees to loan operating capital to ACC in the amount of $1.0 million, for which it will receive ACC Convertible Notes.[11] WFY also agrees to pay certain allowed priority and administrative claims if not previously paid by the Debtors. In exchange, WFY is to receive additional ACC Convertible Notes equaling the value of all such claims paid, payable over ten years with interest at 9%.

The Unsecured Creditors Committee filed certain adversary complaints against WFY and High Plains. The Committee has agreed to dismiss those complaints upon WFY's payment of the $1.0 million to ACC to be used as operating capital. In exchange for each dollar of such capital, WFY will receive (i) one dollar principal amount of ACC Convertible Notes; (ii) two and one-half shares of ACC Class A Preferred Stock; and (iii) two and one-half shares of ACC Class B Preferred Stock.

---

[11]The Plan is not specific as to whom, or in what combination, among the 3 corporations and 5 individuals that make up the "Ward Entities," will actually be making the $1.0 million loan to ACC. For ease of reference, the Court refers to the lenders as WFY.

WFY also agrees to provide ACC other financing and feed yard services on customary market terms. WFY also agrees to allow ACC to participate under a special supply agreement between WFY and one of its beef purchasers.

In addition to the foregoing, the Plan permits the holders of allowed unsecured claims to invest in ACC to the extent of $800,000 in the aggregate. In consideration of any such investments, the participating creditors will receive (i) an amount of ACC Convertible Notes equal to their investment and (ii) a number of shares of ACC Class A Preferred Stock equal to three times the amount of their investment.

In addition to these factors, WFY argues that the Court should also take into consideration the special notice, albeit untimely, given to the Twifords and their lawyers of Release 8.3, in determining whether the Releases are appropriate.

It should be pointed out that no party in interest objected to any of the Releases. The Court raised concerns about the Releases based upon its view of the *Airadigm* decision. The Court did not raise any issue with Release 6.7, which releases the Ward Entities and certain other parties involved in the bankruptcy cases from liability for any act or omission arising out of their conduct in these cases, except for gross negligence or wilful misconduct. The language of Release 6.7 is almost identical to the release of TDS approved in *Airadigm*.

Releases 4.2.13 and 8.3, however, go far beyond what the Seventh Circuit approved in *Airadigm*. They release not just claims arising out of the bankruptcy cases, but pre-petition claims also, including claims based on nonbankruptcy law, that exist outside of bankruptcy and that have nothing to do with the bankruptcy proceedings. They release claims held not only by the Twifords but by any of the Debtors' creditors, without regard

13

to actual notice of the Plan or of the bankruptcy cases, and whether scheduled or not.  In this Court's view, these Releases are fairly and properly characterized as blanket releases.

Acknowledging that broad, blanket releases were frowned upon by the Seventh Circuit in *Airadigm*, the Debtors and WFY contend that the Court is not bound by and need not consider the reasoning used by the Seventh Circuit in support of the *Airadigm* holding. They argue that the court's reasoning is limited by the facts of *Airadigm*, which are entirely different from the facts of the Debtors' cases.  They maintain that the *Airadigm* decision, by rejecting Section 524(e) as a prohibition, opens the door to third-party releases without establishing any particular guidelines or limitations, so that the issue of whether a release is "appropriate" is to be considered *sui generis.*

This Court disagrees.  It is a well established principle that the holding of a case includes, besides the facts and outcome, the reasoning essential to that outcome.  *Tate v. Showboat Marina Casino Partnership,* 431 F.3d 580, 582 (7th Cir. 2005) (Posner, J.).  The reasoning used by Judge Flaum to support the court's holding in *Airadigm* includes the following:

> In this case, the bankruptcy court did not exceed its authority in granting the limitation on TDS's liability.  Ultimately, whether a release is "appropriate" for the reorganization is fact intensive and depends on the nature of the reorganization.  Given the facts of this case, we are satisfied that the release was necessary for the reorganization and appropriately tailored. First, the limitation itself is narrow: it applies only to claims "arising out of or in connection with" the reorganization itself and does not include "willful misconduct."  *See Deutsche Bank,* 416 F.3d at 142 (noting that "potential for abuse is heightened when releases afford blanket immunity").  This is not "blanket immunity" for all times, all transgressions, and all omissions.  Nor does the immunity affect matters beyond the jurisdiction of the bankruptcy court or unrelated to the reorganization itself.  *See* 28 U.S.C. § 157(b); *Cf. In re Johns-Manville Corp.,* 517 F.3d 52 (2d Cir.2008).  Thus, should TDS have

14

recklessly committed some wrong during the 2000 or 2006 proceedings, it
would still be liable to the FCC or any other third party.

519 F.3d at 657.  As a bankruptcy court sitting in the Seventh Circuit, this Court is bound

to apply that reasoning as part of the holding of *Airadigm.*

No Court of Appeals supports the "wide open door" policy for third-party releases

advocated by the Debtors and by WFY.  The Ninth and Tenth Circuits do not permit third-

party releases at all.[12]  The Second Circuit rejected a third-party release similar to Releases

4.2.13 and 8.3 in *In re Metromedia Fiber Network, Inc.,* 416 F.3d 136 (2nd Cir. 2005).  Like those

Releases, the release set forth in *Metromedia's* plan proposed to release several non-debtor

parties from any and all claims related to the debtor or its subsidiaries that arose before the

effective date of the plan, including claims that arose before bankruptcy.  Stating its view

that third-party releases are proper only in rare cases, such as a plan providing for the

global settlement of mass tort claims against the debtor and co-liable third parties, where

substantial financial contributions from the third parties make the reorganization possible.

*Id.* at 141.  The court was careful to note that Section 105(a) does not allow the bankruptcy

court to create substantive rights that are otherwise unavailable under applicable law.  *Id.*

at 142.

The Third Circuit addressed the issue in *In re Continental Airlines,* 203 F.3d 203 (3rd

Cir. 2000).  Also noting the limited scope of Section 105(a), the court rejected the district

court's conclusion that a purported "identity of interest" between the debtor and the third-

party releasees warranted the releases, stating:

> We conclude that granting permanent injunctions to protect non-
> debtor parties on the basis of theoretical identity of interest alone would turn

---

[12]*See* n.9, *supra.*

bankruptcy principles on their head.  Nothing in the Bankruptcy Code can be construed to establish such extraordinary protection for non-debtor parties.

203 F.3d at 217.

The Fourth Circuit, in *In re A.H. Robins Co., Inc.,* 880 F.2d 694 (4th Cir. 1989), held that Section 524(e) does not operate as an absolute bar to third-party releases.  The challenged provision sought to enjoin suits connected to the Dalkon Shield, against certain third parties, specifically the debtor's directors and insurers and their lawyers.  The court allowed the injunction as a proper exercise of the bankruptcy court's equity powers, noting, however, that the class of creditors affected by the injunction were to be paid in full under the plan.

The Sixth Circuit, in *In re Dow Corning Corp.,* 280 F.3d 648 (6th Cir. 2002), also dealing with mass tort claims, held that although under certain circumstances, a bankruptcy court may enjoin a nonconsenting creditor's claim against a non-debtor to facilitate a Chapter 11 plan of reorganization, the record did not support a finding of unusual circumstances.  The court characterized third-party injunctions or releases as dramatic measures to be used cautiously only in unusual circumstances evidenced by the presence of each of seven factors, as follows:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The

16

bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* at 658.

The Seventh Circuit's *Airadigm* opinion should be viewed in the context not only of the decisions of its sister Circuits, but also in the context of the prevalence of the particular release in question there – similar to Release 6.7 – in other Chapter 11 plans.  In fact, inclusion in a plan of reorganization of a narrow release of claims relating to the bankruptcy case, running in favor of the debtor, the creditors committee and all professionals and advisors, now appears to be *de rigueur* in cases filed in New York and Delaware.[13]  *See In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr.S.D.N.Y. 2006); *In re PWS Holding Corp.*, 228 F.3d 224, 246-47 (3rd Cir. (Del.) 2000).  As one court has explained, the now customary exculpation for acts and omissions in connection with the plan and the bankruptcy case requires, in effect, that any claims in connection with the case be raised in the case and not saved for future litigation.  *In re Granite Broadcasting Corp.*, 369 B.R. 120, 139 (Bankr.S.D.N.Y. 2007).  The court was careful to note that the release did not extend back in time to prepetition activities.  *Id.* at 140.  Where such releases exculpate only negligent conduct that occurs during the bankruptcy case, relating to the plan or other aspects of the bankruptcy case, they have been found to be "reasonable and customary and in the best interests of the estates."  *In re Enron Corp.*, 326 B.R. 497, 504 (S.D.N.Y. 2005).

The release at issue in *Airadigm* was nothing more than the kind of narrowly tailored release that is customary in Chapter 11 plans of reorganization in the many cases filed in

---

[13]The Southern District of New York and the District of Delaware have the highest volume of Chapter 11 filings, by far, and are the cradle of innovation.  Once a new tactic, pleading or provision, gets approved for use in New York or Delaware, it seems to spread across the country like a highly contagious virus.

New York and Delaware. Nevertheless, it was not simply rubber stamped by the Seventh

Circuit, which applied a three-part analysis. Most importantly, in the reasoning supporting

its holding, the court contrasted the narrow release in the debtor's plan with broader ones

that provide blanket immunity, where the potential for abuse is heightened. *Airadigm,* 519

F.3d at 657. The court also specifically pointed out that the release did not "affect matters

beyond the jurisdiction of the bankruptcy court or unrelated to the reorganization itself."

*Id.*

This Court concludes, first, that it is wrong to construe the *Airadigm* opinion as one

in which the Seventh Circuit wholeheartedly embraces all manner of third-party releases.

The opinion rejects, with good reason, the idea that Section 524(e) bars all third-party

releases. But the court only approved, upon the satisfaction of three conditions, the

narrowly tailored, bankruptcy case-specific release that is commonly seen in many Chapter

11 plans. There is nothing in the opinion to indicate that the court was signaling an intent

to go beyond approval of that customary, narrow release or that the court was rejecting the

limits established by the Second, Third, Fourth and Sixth Circuits.

Second, this Court rejects the suggestion that the Seventh Circuit's reasoning in

support of its holding is immaterial. Nothing in the language of the opinion supports that

novel proposition. The Seventh Circuit's comparative references to blanket immunity and

matters outside of the bankruptcy court's jurisdiction are properly taken as instructive

guidance as to what the Seventh Circuit would find to be inappropriate. In this Court's

view, Releases 4.2.13 and 8.3 give blanket immunity to the Ward Entities and High Plains.[14]

---

[14]The only limitation in Release 4.2.13 is that the transaction or occurrence at issue somehow involve or be related to one or both of the Debtors. And even that limitation is not contained in Release 8.3. The former bars claims and causes of action held by the Debtors' creditors or any "party-in-interest" in the bankruptcy cases. The latter bars actions by

They also purport to release any liability to the Twifords in the Wyoming lawsuit, a prepetition state court suit over which this Court has no jurisdiction.

Third, the *Airadigm* opinion should not be construed as expanding the bankruptcy court's equitable powers under § 105(a) beyond the traditional limits on those powers. Less than one year before issuing the *Airadigm* decision, the Seventh Circuit reiterated its view that Section 105(a) is not a roving commission to do equity, that the court's equitable discretion is limited by the substantive provisions of the Bankruptcy Code. *Village of Rosemont v. Jaffe,* 482 F.3d 926, 935 (7th Cir. 2007). While the Seventh Circuit in *Airadigm* ruled that Section 524(e) is not an absolute bar to third-party releases, that provision nonetheless remains one of the most fundamental substantive provisions in the Code. As such, prudence demands that third-party releases be viewed with a healthy dose of skepticism. This Court is aware of no authority, outside of the mass tort context, that supports the granting in the plan of a nonconsensual third-party release of claims other than for acts or omissions made in the bankruptcy proceeding, with gross negligence and wilful misconduct excluded. *Airadigm* supports such a limited release, under certain conditions, and nothing more.

Fourth, the Seventh Circuit phrased its holding as permitting a release of third parties for liability "to participating creditors" if appropriate. *Airadigm,* 519 F.3d 657. This reference can only be to creditors of the debtor who are participating in the bankruptcy case at least to the extent that they have actual notice and opportunity to object to the

---

"Holders" of "Claims" as those terms are defined in the Plan.

At the confirmation hearing, WFY asserted that the releases would bar only derivative claims and not direct claims asserted by third parties against WFY. The releases are not so limited.

release provision. As indicated above, the Twifords did not receive the full period of notice to which they are entitled by Rule. And other releasors who were not scheduled creditors would have received no notice at all  and could not be said to be "participating creditors."

Fifth, although some equitable considerations, summarized above, run in WFY's favor, which WFY has vigorously emphasized, others do not. One of the biggest flaws with Releases 4.2.13 and 8.3 is that neither the Twifords nor any other so far unidentified releasors will receive any compensation for losing their claims. Under the Plan, allowed unsecured claimholders will receive Class B Preferred Stock in ACC, which may or may not be of any value or result in a future payment. The Twifords, however, under the agreed stay relief order negotiated by the Debtors, do not have an allowed unsecured claim.[15] Neither do unidentified releasors. These parties have not consented to the Releases and are receiving no consideration whatsoever through the Plan. This result would be entirely unfair and inequitable to the Twifords and other releasors.

Sixth, although the Plan is dressed up to look like a reorganization, it is in essence one of liquidation. One of the Debtors, Berwick, a corporation, is being merged out of existence, after all of its assets have been liquidated.[16] The other, Ray, an individual, has also had substantially all of his nonexempt assets liquidated. As previously noted, the Plan provides for substantive consolidation of the Debtors' estates with Ray to be considered the surviving entity. A liquidating trust is established for the purpose of liquidating the remaining assets of the estates for the benefit of the administrative claimants, unsecured creditors and WFY. After payment of administrative claims and certain other expenses of

---

[15]Even if the Twifords had not waived their unsecured claims, the interest of Class B Preferred Stockholders in ACC is too speculative to constitute valuable present consideration of a kind that might support a nonconsensual release.

[16]The Plan provides that Berwick will be merged with and into ACC immediately after the effective date of the Plan.

the trust, the remaining funds are not being distributed to general unsecured creditors but are to be paid to ACC.  Ray will be an employee of and minority owner of ACC, which is being capitalized by proceeds from the trust as well as post-confirmation loans from WFY and a few other creditors.[17]  ACC cannot be considered to be a continuation of Berwick's or of Ray's cattle business.  It is a new venture between Ray and WFY.[18]  The fact that the new business is also in the cattle industry, in no way renders it a continuation or reorganization of the failed businesses previously conducted by the Debtors.  In addition, another hallmark of liquidation is that neither Berwick nor Ray are making any payments under the Plan.  In fact, Ray is to receive an immediate discharge, unusual for a post-BAPCPA Chapter 11 individual debtor, apparently in reliance upon the distribution of ACC preferred stock to unsecured creditors in lieu of any payments.[19]  The rationale for granting third-party releases is far less compelling, if it exists at all, in a liquidation than in a reorganization.

Seventh, Releases 4.2.13 and 8.3 purport to run in favor of three corporations and five individuals who are defined, together, as the Ward Entities.  At the confirmation hearing, WFY's argument centered around the $1.0 million loan to ACC.  Readers of the Plan, however, are left to speculate out of whose pocket those funds are actually coming.  Even if all other problems with the Releases were resolved, it is only those making a

---

[17]At the confirmation hearing, WFY relied heavily on the assertion that it was "funding" the Plan by contributing $1 million in new money ostensibly for the benefit of unsecured creditors.  A careful reading of the Plan documents, however, clearly indicates that WFY will have a majority ownership interest in and will control the Board of Directors of ACC and will be entitled to recover its contribution before general unsecureds get anything.

[18]In the Wyoming suit, WFY denied being in a partnership or joint venture with Ray or Berwick.  In ACC, WFY and Ray are undeniably in business together.

[19]Section 1141(d)(5)(A) provides that an individual debtor in Chapter 11 may not receive a discharge until all payments under the plan have been made unless, after notice and a hearing, the court orders otherwise for cause.

substantial financial contribution who would be entitled to a release. Without knowing the specific identity of the lenders, and the amount loaned by each, the Court is in no position to make the necessary evidentiary determination that might support the granting of third-party releases. *See, Airadigm,* 519 F.3d at 657.

Eighth, the Releases include High Plains as a named releasee. High Plains is contributing nothing of value to ACC or the unsecured creditors. It did agree to waive its deficiency claim so as not to further dilute the ACC Class B preferred shareholders. That waiver does not provide any present value to creditors, however, and is wholly insufficient to warrant the benefit to High Plains of a general release. WFY argues that as a guarantor of High Plains, the release of High Plains is necessary to provide a full release to WFY. In the Court's view, granting a blanket release to High Plains would be gratuitous, inequitable and inappropriate.[20]

Ninth, as indicated previously, releasors who were not "participating creditors" and the Twifords were not given sufficient notice under F.R.B.P. Interim Rule 2002(b) and the special notice given to the Twifords refers to only one of the three Releases. WFY argues that the Court should take into account the special notice given to the Twifords for the purposes of its Section 105(a) analysis. That notice was clearly deficient, however. Even if it had been adequate, notice of a substantively inappropriate release cannot transform it into an appropriate one.

Last but certainly not least, the jurisdictional basis for a bankruptcy court to order the release of a non-debtor's claims against another non-debtor, where the claims arise

---

[20]It is no exaggeration to recognize that High Plains has been the primary beneficiary of these bankruptcy cases, through the orderly liquidation of all of its collateral.

outside of the bankruptcy proceeding, is absent. The resolution of such non-debtor claims against WFY would have no effect on the bankruptcy estates and do not involve property of either estate. As such, the claims are outside the scope even of the Court's "related to" jurisdiction. The involvement of the Debtors in the prepetition transactions that gave rise to the third-party claims is not enough to bring the claims within the Court's limited jurisdiction. *Matter of Zale Corp.*, 62 F.3d 746, 753-54 (5th Cir. 1995) (shared facts between third-party action and debtor-creditor conflict do not suffice to make third-party action "related to" the bankruptcy case); *In re Johns-Manville Corp.*, 517 F.3d 52 (2nd Cir. 2008) (bankruptcy court lacked jurisdiction to enjoin third-party claims that sought to recover from non-debtor insurer for its own misconduct). WFY's assertion, which the Court accepts as true and not as a bluff, that all three Releases are absolutely necessary to confirmation of the Plan, because it will not provide the funding to ACC without them, is also insufficient to accord jurisdiction where it does not otherwise exist.

For the foregoing reasons, the Court holds that it is without jurisdiction to order the release of third-party claims embodied in Releases 4.2.13 and 8.3. Even if jurisdiction existed, those Releases are not "appropriate" under Sections 105(a) and 1123(a)(6). Accordingly, confirmation of the Plan will be denied. The Clerk will be directed to set a status hearing to consider the status of the cases and the possibility of conversion to Chapter 7.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###